## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GULF RESTORATION NETWORK, INC. )
338 Baronne Street, Suite 200 )
New Orleans, LA 70112 )
    )
FOOD & WATER WATCH )
1616 P Street, NW, Suite 300 )
Washington, DC 20036 )
    )
        Plaintiffs, )
    )
        v. )
    )
NATIONAL MARINE FISHERIES SERVICE
NOAA Fisheries Service
1315 East West Highway
Silver Spring, MD 20910

Case: 1:09-cv-01883
Assigned To : Kessler, Gladys
Assign. Date : 10/2/2009
Description: Admn. Agency Review

JAMES W. BALSIGER, in his official capacity as )
Assistant Administrator for Fisheries )
National Marine Fisheries Service )
1315 East West Highway, Room 14636 )
Silver Spring, MD 20910 )
    )
NATIONAL OCEANIC AND ATMOSPHERIC )
ADMINISTRATION )
1401 Constitution Avenue, NW, Room 5128 )
Washington, DC 20230 )
    )
GARY LOCKE, in his official capacity as United )
States Secretary of Commerce )
U.S. Department of Commerce )
1401 Constitution Avenue, NW, Room 5516 )
Washington, DC 20230 )
    )
        Defendants. )
    )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I.    INTRODUCTION

1.      Plaintiffs challenge the Fishery Management Plan for Regulating Offshore Marine Aquaculture in the Gulf of Mexico ("Gulf FMP") which took effect on September 3, 2009, by operation of law, due to the failure by the Secretary of Commerce and other Defendants, National Oceanic and Atmospheric Administration ("NOAA"), National Marine Fisheries Service ("NMFS"), and the Assistant Secretary for Fisheries James Balsiger to take legal action required by the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1854(a)(3) ("Magnuson Act"). The Gulf FMP creates the first-ever permit program authorizing the commercial propagation and rearing of fish in federal waters and the enclosure and control of those waters to allow the raising of such farmed fish for commercial purposes.

2.      Because Defendants have a legal duty under the Magnuson Act to determine whether the Gulf FMP is consistent with applicable law and then to take discrete action regarding the Gulf FMP which they have not yet done, Plaintiffs urge this Court (i) to vacate the FMP and Defendants' decision to allow it to take effect, and (ii) to compel Defendants to take the specific action mandated by the Magnuson Act: to disapprove, approve, or partially approve the FMP. 16 U.S.C. § 1854(a)(3). The Secretary's unprecedented failure to take this discrete action has led to the creation of the first-ever commercial aquaculture permit program without the necessary determination under section 304(a)(3) of whether this program is consistent with the Magnuson Act or other applicable laws.

3.      Even if the statute did not explicitly require Secretarial action, the Court should vacate the FMP and enjoin Defendants from approving and implementing it. Because the Gulf FMP would establish a permitting framework for commercial aquaculture, including the exclusion of fishing from permitted areas, Defendants do not have authority under the Magnuson Act to permit commercial aquaculture in federal waters, so their decision to allow the FMP to

2

take effect was ultra vires, 5 U.S.C. § 706(2)(C) ("in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right"), and an "abuse of discretion, or otherwise not in

accordance with law," *id.* § 706(2)(A). Their authority extends solely to disapprove the plan. In

the alternative, even if they had any authority beyond this, because Defendants' decision to allow

the Gulf FMP to take effect is inconsistent with the Magnuson Act including the Act's National

Standards, 16 U.S.C. § 1851(a), and also is unlawful, arbitrary and capricious under the National

Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Administrative

Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), Plaintiffs urge the Court to enjoin Defendants

from approving, partially approving, or implementing the Gulf FMP.

## II.     JURISDICTION AND VENUE

4.      This court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 2201

(declaratory relief), § 2202 (injunctive relief), § 1651(a) (writs), 16 U.S.C. § 1855(f) (Magnuson

Act), and 5 U.S.C. §§ 702, 704 (APA).

5.      Venue is proper in the U.S. District Court for the District of Columbia under 28

U.S.C. § 1391(e). Plaintiff Food & Water Watch is headquartered or resides in the District of

Columbia. A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred

in the District of Columbia. Defendants Secretary Locke, in his official capacity, and the

National Oceanic and Atmospheric Administration, are headquartered in the District of

Columbia.

## III.    PARTIES

6.      Plaintiff GULF RESTORATION NETWORK, INC. ("GRN") is a non-profit

Louisiana corporation with its principal place of business in New Orleans, Louisiana. GRN is a

network of environmental, social justice, and citizen's groups and individuals committed to

uniting and empowering people to protect and restore the natural resources of the Gulf of Mexico

Region for future generations.  GRN currently has 43 local, regional, and state-based group

members.  GRN also has approximately 5,000 individual members who live in the Gulf of

Mexico Region or around the nation.  GRN, its member groups, and individual members are

closely involved in protecting endangered and threatened species in the Gulf Region and

advocating for sound conservation and management of the Gulf's fisheries and natural resources,

including regarding the need to prevent harm to the Gulf's natural resources likely to be caused

by aquaculture.

      7.      Plaintiff FOOD & WATER WATCH, INC. ("FWW") is a national non-profit

public interest consumer advocacy organization, headquartered in Washington, D.C., that works

to ensure safe food and clean water.  FWW advocates for safe, wholesome food produced in a

humane and sustainable manner, and public rather than private control of water resources,

including oceans, rivers, and groundwater.  The FWW Fish Program promotes clean, green, safe

seafood for consumers, while helping to protect the environment and support the long-term well-

being of coastal and fishing communities.  FWW has advocated against various proposals for

permitting marine aquaculture facilities without adequate safeguards because of the harm they

can cause to the marine environment, impacts to the long term well-being of coastal and fishing

communities, and consumer health concerns associated with fish produced from such facilities.

FWW members include commercial and recreational fishermen and women, conservationists,

and consumers. There are about 760 FWW members located throughout states bordering the

Gulf of Mexico.

      8.      Defendant GARY LOCKE is the Secretary of the United States Department of

Commerce, and has ultimate responsibility for the duties and programs of the Magnuson Act, the

National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service. Secretary Locke is sued in his official capacity.

9.      Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION ("NOAA") is the agency within the U.S. Department of Commerce to which the Secretary of Commerce has delegated authority and stewardship duties of fisheries management under the Magnuson Act.

10.      Defendant NATIONAL MARINE FISHERIES SERVICE ("NMFS") is the agency within the U.S. Department of Commerce's National Oceanic and Atmospheric Administration to which NOAA has delegated authority and stewardship duties of fisheries management under the Magnuson Act.

11.      Defendant JAMES W. BALSIGER is the Acting Assistant Administrator for Fisheries at NMFS, and has responsibility for implementing and fulfilling all of that agency's duties.  Acting Assistant Administrator Balsiger is sued in his official capacity.

12.      Collectively, Defendants named in the above paragraphs shall be referred to as "Defendants" or "NMFS" in this Complaint.

### IV.     STATUTORY BACKGROUND

#### A.      <u>The Magnuson-Stevens Fishery Conservation and Management Act</u>

13.      The Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act" or "MSA"), 16 U.S.C. § 1801, *et seq.*, governs fishing and wild fish conservation within the U.S. Exclusive Economic Zone ("EEZ"), including the federal waters of the Gulf of Mexico. Congress enacted this law to "take immediate action to conserve and manage the fishery resources found off the coast of the United States." 16 U.S.C. § 1801(b)(1).  The Magnuson Act established a national fishery management program for the "conservation and management of the fishery resources of the United States," in order "to prevent overfishing, to rebuild overfished

stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to

realize the full potential of the Nation's fishery resources." *Id.* § 1801(a)(6). The Magnuson Act

set ten "national standards for fishery conservation and management." *Id.* § 1851(a)(1)-(10).

14.     The Magnuson Act established regional fishery management councils, including

the Gulf of Mexico Fishery Management Council ("Gulf Council") to assist with conservation

and management pursuant to the Magnuson Act. *Id.* § 1852. Under the Magnuson Act, each

Council must prepare a "fishery management plan" for each fishery in its region "that requires

conservation and management." *Id.* § 1852(h)(1).

15.     Such a fishery management plan must be "necessary and appropriate for the

conservation and management of the fishery," and meet both substantive and procedural

requirements. *Id.* § 1853(a)(1)(A). In addition, section 303(a)(7) of the Magnuson Act requires

that any FMP "describe and identify essential fish habitat . . . , minimize to the extent practicable

adverse effects on such habitat caused by fishing, and identify other actions to encourage the

conservation and enhancement of such habitat." *Id.* § 1853(a)(7). Section 303(a)(10) requires

the FMP to "specify objective and measurable criteria for identifying when the fishery to which

the plan applies is overfished." *Id.* § 1853(a)(10). Section 303(a)(9) requires that each FMP

include a fishery impact statement that assesses the conservation, economic, and social impacts

from conservation and management measures, including cumulative impacts, along with any

potential mitigation measures. *Id.* § 1853(a)(9). Each FMP must also be consistent with

National Standards set forth in the Magnuson Act. *Id.* §§ 1853(a)(1)(C), 1851(a); *see* 50 C.F.R.

§§ 600.305 - 600.355.

16.     National Standard One of the Magnuson Act provides that "[c]onservation and

management measures shall prevent overfishing while achieving, on a continuing basis, the

optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1);

50 C.F.R. § 600.310.

17. National Standard Two of the Magnuson Act provides that "[c]onservation and

management measures shall be based upon the best scientific information available." 16 U.S.C. §

1851(a)(2); *see also id.* § 1801(a)(8) ("[t]he collection of reliable data is essential to the effective

conservation, management, and scientific understanding of the fishery resources of the United

States"); 50 C.F.R. § 600.315.

18. National Standard Four of the Magnuson Act provides that "[c]onservation and

management measures shall not discriminate between residents of different States. . . ." 16

U.S.C. § 1851(a)(4); 50 C.F.R. § 600.325.

19. National Standard Five of the Magnuson Act provides that "[c]onservation and

management measures shall, where practicable, consider efficiency in the utilization of fishery

resources; except that no such measure shall have economic allocation as its sole purpose." 16

U.S.C. § 1851(a)(5); 50 C.F.R. § 600.330.

20. National Standard Eight of the Magnuson Act provides that "[c]onservation and

management measures shall, consistent with the conservation requirements of this Act (including

the prevention of overfishing and rebuilding of overfished stocks), take into account the

importance of fishery resources to fishing communities by utilizing economic and social data

that meet the requirements of paragraph (2), in order to (A) provide for the sustained

participation of such communities, and (B) to the extent practicable, minimize adverse economic

impacts on such communities." 16 U.S.C. § 1851(a)(8); 50 C.F.R. § 600.345.

21.     National Standard Nine provides that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." 16 U.S.C. § 1851(a)(9); 50 C.F.R. § 600.350.

22.     NMFS, by delegation from the Secretary and NOAA, has the authority and duty to review each FMP and must disapprove any such FMP that is inconsistent with the national standards, other provisions of the Magnuson Act, or any other applicable law. *Id.* § 1854(a)(3); *see also* 16 U.S.C. § 1854(b) (NMFS authority to determine whether any proposed regulations submitted by the Council may take legal effect and to promulgate final regulations).

23.     Upon receiving a proposed FMP from a fishery management council, the Magnuson Act directs that the Secretary "shall . . . immediately commence a review of the plan . . . to determine whether it is consistent with the national standards, the other provisions of this Act, and any other applicable law." *Id.* § 1854(a)(1)(A). Further, in this review, the Secretary "shall . . . take into account the information, views, and comments received from interested persons." *Id.* § 1854(a)(2)(A).

24.     Upon completing the review of the FMP and making the necessary determination as to its consistency with law, the Magnuson Act mandates that:

> [T]he Secretary shall approve, disapprove, or partially approve a plan or amendment within 30 days of the end of the comment period . . . by written notice to the Council. A notice of disapproval or partial approval shall specify—(A) the applicable law with which the plan or amendment is inconsistent; (B) the nature of such inconsistencies; and (C) recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law.

*Id.* § 1854(a)(3). As further provided, "[i]f the Secretary does not notify a Council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment shall take effect as if approved." *Id.*

8

**B.**     **The National Environmental Policy Act ("NEPA")**

25.     The purpose of the National Environmental Policy Act ("NEPA") is to "promote

efforts which will prevent or eliminate damages to the environment."  42 U.S.C. § 4321.  NEPA

requires federal agencies to fully consider and disclose the environmental consequences of an

agency action before proceeding with that action.  *Id.* § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5.

Agencies' evaluation of environmental consequences must be based on "accurate scientific

information" of "high quality."  40 C.F.R. § 1500.1(b).  If there are not sufficient data available,

the agency must follow the requisite procedure for addressing or evaluating the impacts in view

of incomplete or unavailable information.  *Id.* § 1502.22.

26.     An environmental impact statement (EIS) is required for all "major Federal

actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C);

40 C.F.R. § 1501.4.  The EIS must specify and describe "the underlying purpose and need to

which the agency is responding in proposing the alternatives including the proposed action."  40

C.F.R. § 1502.13.

27.     The EIS also must provide a "full and fair discussion of significant environmental

impacts and . . . inform the decisionmakers and the public of reasonable alternatives which

would avoid or minimize adverse impacts or enhance the quality of the human environment."  *Id.*

§ 1502.1.  The scope of the EIS must consider a range of related actions, alternatives, and

impacts.  *Id.* § 1508.25.

28.     In the EIS, the federal agency must identify the direct, indirect, and cumulative

impacts of the proposed action, consider alternative actions and their impacts, and identify all

irreversible and irretrievable commitments of resources associated with the proposed action.  42

U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1502.14.  Direct effects are those "which are

caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).  Indirect

effects are "caused by the action and are later in time or farther removed in distance, but are still

reasonably foreseeable."  *Id.* § 1508.8(b).  Cumulative impacts are impacts from "past, present

and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or

person undertakes such other actions."  *Id.* § 1508.7.  "Cumulative impacts can result from

individually minor but collectively significant actions taking place over a period of time."  *Id.*

29.     NEPA requires agencies to consider "alternatives to the proposed action." 42

U.S.C. § 4332(C)(iii) & (E); 40 C.F.R. § 1508.25. The analysis of alternatives is the "heart" of

the NEPA process and must provide "a clear basis for choice among options by the

decisionmaker and the public." 40 C.F.R. § 1502.14.

30.     NEPA also requires agencies to disclose and analyze measures to mitigate the

impacts of proposed actions.  40 C.F.R. §§ 1502.14(f), 1502.16(h).  An agency's analysis of

mitigation measures must be reasonably complete in order to properly evaluate the severity of

the adverse effects of an agency's proposed action prior to the agency making a final decision.

31.     Finally, cooperating agencies must be consulted during the NEPA process and

their input taken into account.  42 U.S.C. § 4332(2)(C).

## V.     ALLEGATIONS

### A.     General Allegations

32.     Marine aquaculture is the process of farming or ranching fish or aquatic

organisms in ocean waters.  This process may include installing a fish farm into waters

(including all elements of that farm from the fish themselves to the facility and materials placed

into the waters to hold them, such as cages or pens), raising the fish by feeding them products

derived from wild fish as food and using antibiotics, parasiticides, antifoulants, and other drugs

and chemicals, and then removing those fish from the aquatic farm for some purpose outside of the waters in which they were raised, such as commercial sale or scientific study.

33.    The Magnuson Act does not provide Defendants with authority to permit commercial aquaculture.  It includes mention of only one type of aquaculture operation for the purpose of conservation: "to restore overfished New England groundfish stocks."  16 U.S.C. § 1863(a)(1)(E) (authorizing the establishment of a Northwest Atlantic Ocean Fisheries Reinvestment Program).

34.    The Magnuson Act and accompanying regulations do not define the term "aquaculture" because the Magnuson Act does not explicitly or implicitly include aquaculture permitting within Defendants' authority.  *Id.* § 1802 (definitions); 50 C.F.R. § 600.10 (definitions).  The Magnuson Act and accompanying regulations do not explicitly or implicitly authorize the practice of aquaculture for commercial purposes.

35.    The Magnuson Act further does not grant Defendants the authority to close off portions of the ocean for exclusive commercial use or to prevent fishing there for the sole purpose of allowing commercial fish farming to occur in the enclosed waters.

36.    Aquaculture has the potential to cause serious harm to the oceanic ecosystem and aquatic species and organisms, including a broad range of serious environmental impacts, such as but not limited to: (1) benthic, water quality, and similar impacts (such as over-feeding, antibiotic medication, algal blooms, and pathogens, chemicals, feed, or other materials placed into waters or used in the aquaculture process); (2) potential use of genetically modified or transgenic organisms with direct and indirect effects; (3) domestication of cultured species with potential harm to wild species; (4) harm resulting from the escape of farmed fish and interbreeding with wild fish populations; (5) use of wild fish as broodstock and as a feed source,

such as fish meal or fish oil, and related overfishing of forage fish stocks; (6) impact of the amplification and re-transmission of disease and parasites from farmed fish to wild fish and natural resources; (7) impacts on essential fish habitat, protected marine areas, and historic fishing grounds; (8) alteration of natural behavior and risk of harm or death to endangered or threatened species or alteration or destruction of critical habitat; (9) entanglement and bycatch impacts on wild fish, sea turtles, sea birds, and marine mammals; (10) other impacts on wild fisheries, such as those that can result from the attraction of species to aquaculture facilities; (11) impacts on human health; (12) cumulative impacts of single or multiple uses of Gulf resources and managed fisheries interacting with aquaculture operations in the Gulf over time and other environmental stressors on ocean ecosystems; (13) indirect impact on other ocean users, including commercial and recreational fishermen, from the closure or exclusive use of an area of the EEZ for aquaculture or the collection or use of natural resources in the aquaculture process; (14) impacts due to storm damage and creation of infrastructure that is not recoverable.

37.     In addition to environmental impacts, the Gulf FMP is likely to cause substantial socioeconomic impacts to recreational and commercial fisheries, and Gulf fishing communities, due to conflict regarding historic fishing areas, harm to wild fish species as a result of aquaculture operations in the Gulf, and market competition and price impacts from the addition of aquacultured species into the local market.

38.     Commenters, including Plaintiffs and the Environmental Protection Agency ("EPA"), submitted significant comments on the Gulf FMP describing and urging Defendants to address these impacts.

**B.**          <u>The Gulf FMP for Regulating Offshore Marine Aquaculture</u>

39.     On January 27, 2009, the Gulf Fishery Management Council approved the final

Fishery Management Plan Regulating Offshore Marine Aquaculture in the Gulf of Mexico

("Gulf FMP") and the Programmatic EIS ("PEIS") and voted to submit the Gulf FMP to the

Secretary of Commerce for review.

40.     On June 4, 2009, NMFS published in the Federal Register a notice of the

availability of the Gulf FMP for public comment, stating that the FMP "is intended to establish a

comprehensive permitting and regulatory framework to manage the development of an

environmentally sound and economically sustainable aquaculture industry in the Gulf of Mexico

exclusive economic zone (EEZ)." NMFS, *Notice*, 74 Fed. Reg. 26,829 (June 4, 2009).[1] NMFS

also made the FMP available on its website and set a deadline of August 3, 2009 for public

comment.  In this notice, NMFS stated that "[a]fter consideration of [certain information], and

consistency with the Magnuson-Stevens Act and other applicable laws, NMFS will publish a

notice of agency action in the Federal Register announcing the Agency's decision to approve,

partially approve, or disapprove the FMP, and the associated rationale." *Id.* at 26,830.

Defendants set August 3, 2009, as the final date of the comment period.

41.     Defendants did not take action to disapprove, approve, or partially approve the

FMP within 30 days after the comment period ended on August 3, 2009.  Nor have they taken

any such action since that time.

42.     On September 3, 2009, Acting Assistant Administrator James Balsiger sent a

letter to the Gulf Council providing notice that defendants were "not taking action on the Plan at

---

[1] The Gulf FMP/PEIS as made available by NMFS for public comment is viewable at
http://www.gulfcouncil.org/Beta/GMFMCWeb/Aquaculture/Aquaculture%20FMP%20PEIS%20
Final%202-24-09.pdf (Feb. 24, 2009).

this time," and calling this an "unprecedented approach to Secretarial review of an FMP." Letter

from James Balsiger, Acting Assistant Administrator for Fisheries to Robert Shipp, Chairman,

Gulf of Mexico Fishery Management Council (Sept. 3, 2009), *available at*

http://sero.nmfs.noaa.gov/sf/pdfs/Letter%20to%20the%20Gulf%20Council%20Regarding%20A

quaculture.pdf. This letter further explained that "[b]ecause the statutory period has passed

without Secretarial action, the FMP has entered into effect by operation of law." *Id.*

43.     Commenters, including Plaintiffs, raised concerns regarding the Gulf FMP during

the process of its consideration by Defendants.  Food & Water Watch submitted comments on

the Gulf FMP to NMFS on August 3, 2009, and to the Council on January 28, 2009 and January

17, 2008.  Food & Water Watch and the Gulf Restoration Network submitted a joint comment

letter to NMFS with many other commenters on July 31, 2009.  GRN also submitted comments

on the Gulf FMP to the Council on January 30, 2008. Another commenter, Ocean Conservancy,

submitted comments raising the issues in this complaint to NMFS on August 3, 2009, and to the

Council on January 26, 2009, October 22, 2008, August 6, 2008, June 3, 2008, April 4, 2008,

and January 17, 2008. The Environmental Protection Agency also submitted comments. Gulf

FMP App. I-1.

44.     The effect of the Gulf FMP is to establish a permitting framework for commercial

aquaculture for the first time anywhere in federal waters, including the Gulf of Mexico.  Gulf

FMP at 397.  The Gulf FMP would allow the culture of any fish species managed by the Council,

except shrimp and corals.

45.     The Gulf of Mexico contains substantial biological diversity and a wealth of

natural resources.  There are currently a number of fishery management plans in place in the

Gulf to conserve and manage wild fish species.  The following are some of the wild species that

are present in the Gulf of Mexico: forty-two species of reef fish (Reef Fish FMP), coastal

migratory pelagic species such as the king mackerel, Spanish mackerel, dolphin, cobia, cero,

bluefish, little tunny; stone crab; spiny lobster; red drum; highly migratory species such as

swordfish, tuna (including the Western Atlantic bluefin tuna), billfish, sharks; twenty-eight

species of marine mammals, including six endangered species (sperm, sei, fin, blue, humpback

and North Atlantic right whale); a number of species of baitfish, including menhaden, Spanish

sardines, round scad, bigeye scad, and Atlantic thread herring. Gulf FMP at 120-133.

46.     Before the Gulf FMP took legal effect, no commercial aquaculture facilities

operated in the Gulf for any fish species managed by the Gulf Council. Gulf FMP at 21.

47.     The Gulf FMP is expected to result in five to twenty commercial aquaculture

facilities to begin operation in the Gulf, with an estimated annual production of 64 million

pounds. Gulf FMP at 1. This amount would be almost double the amount of wild fish caught in

the Gulf of Mexico fisheries annually for all wild species managed by the Gulf Council. Gulf

FMP at 89.

48.     The Gulf FMP is likely to cause both direct and indirect impacts on the physical,

biological, ecological, social, and administrative environments, as described in paragraph 36.

*See* Gulf FMP at 408.

49.     The Gulf FMP is likely  to cause unavoidable adverse effects, including the loss

of fishing grounds, localized water quality and benthic changes, and the exclusive use of a public

resource for private profit. Gulf FMP at 372-73.

C.    **Additional Magnuson Act Allegations**

50.    The Gulf FMP is inconsistent with the Magnuson Act because Defendants have not determined and could not determine that aquaculture is necessary to conserve and protect wild fish within the managed species of the Gulf.  Because the Gulf FMP does not demonstrate that aquaculture is just as likely to harm rather than conserve or manage wild species in the Gulf, the plan is inconsistent with the Magnuson Act.

51.    The Gulf FMP's primary purpose is economic or commercial rather than conservation or management of existing fishery resources, and thus is inconsistent with the core section 303 requirement, 16 U.S.C. § 1853(a)(1)(A), and with National Standard Five, *id.* § 1851(a)(5), which bars "economic allocation" from being the purpose of Magnuson Act action.

52.    The Gulf FMP does not include each element required for fishery management plans under section 303 of the Magnuson Act, 16 U.S.C. § 1853.  In particular, it does not appropriately address essential fish habitat, minimize adverse effects on such habitat, or identify actions to encourage the conservation and enhancement of such habitat.  *Id.* § 1853(a)(7).  For example, the standards and criteria for the siting and operation of aquaculture facilities set forth in the Gulf FMP are inadequate to prevent significant environmental harm from these operations. Gulf FMP at 351.

53.    In addition, the Gulf FMP does not define thresholds for determining overfishing and overfished status as required by section 1853(a)(10).  Gulf FMP at 90, 343-44.

54.    In addition, the Gulf FMP includes only a conclusory fishery impact statement that does not satisfy the Magnuson Act requirements under section 303(a)(9), 16 U.S.C. § 1853(a)(9).  *See* Gulf FMP at 408.  It includes insufficient discussion of impacts of offshore aquaculture on wild fish, the Gulf aquatic ecosystem, and on existing fisheries and local fishing

communities. The statement fails to address or evaluate mitigation measures that might reduce such potential impacts.

55.     Inconsistent with National Standard Two, 16 U.S.C. § 1851(a)(2), although Plaintiffs and other commenters submitted substantial scientific data and peer-reviewed research on the impacts of ocean aquaculture and the need for strong environmental controls, Defendants did not address or incorporate these data. The Gulf FMP is not based upon the best scientific information available because there has been no appropriate consideration of or response to the scientific data presented by commenters. The Gulf FMP does not discuss pertinent information about ecological impacts from existing aquaculture operations located in other areas of the world.

56.     The Gulf FMP does not include measures necessary to prevent overfishing of wild fish as required by National Standard One, *id.* § 1851(a)(1). Without effectively addressing how aquaculture will interact with and affect the survival of wild fish, the Gulf FMP is unable to address whether or how aquaculture might prevent overfishing. Further, because the Gulf FMP would not restrict aquaculture to species that have been or are being overfished in the wild, there is no support for the conclusion that aquaculture would reduce fishing pressure on wild managed species. The Gulf FMP does not define thresholds for determining overfishing and overfished status. Gulf FMP at 90, 343-44.

57.     Inconsistent with National Standards Four, Five, and Eight, 16 U.S.C. § 1851(a)(4), (5), (8), the Gulf FMP would exclude commercial and recreational fishing for wild fish in certain areas and would ban or restrict other uses of areas of the Gulf EEZ that are to be closed for aquaculture based upon a permit issued pursuant to the Gulf FMP. The Gulf FMP does not establish a fair or equitable allocation of fishery resources because there are insufficient

standards or criteria set to protect the interests of existing commercial and recreational fishermen and women, and their customers and families, from the encroachment of aquaculture facilities on their fishing grounds, and related harm to wild fish that they enjoy and on which their livelihoods depend.  The Gulf FMP would allow aquaculture of most species native to the Gulf, including many fished by existing recreational and commercial fisheries.  The Gulf FMP did not adequately address or consider the best available data on the importance of the Gulf's wild fishery resources to fishing communities or the likely economic impact of aquacultured fish creating market competition with wild fish.

58.    Inconsistent with National Standard Nine, *id.* § 1851(a)(9), the Gulf FMP also does not include conservation and management measures necessary to minimize bycatch or the mortality of bycatch, such as sharks, sea turtles, sea birds, marine mammals, or other marine life that may swim through or become caught in aquaculture facilities, cages, or other equipment.  The Gulf FMP/PEIS did not effectively respond to EPA's comments, generally, such as the concern raised that it was necessary for the Gulf FMP to discuss in appropriate detail "how any problematic sea birds, sea turtles and marine mammals will be controlled and how their potential entanglement would be resolved."  EPA Comments at 3 (Gulf FMP at App. I-3).

**D.    Additional NEPA Allegations**

59.    The proclaimed "purpose and need" of the Gulf FMP/PEIS presents two legal problems.  First, it states that "[t]he purpose of the Aquaculture FMP is to maximize benefits to the Nation by establishing a regional permitting process to manage the development of an environmentally sound and economically sustainable aquaculture industry in federal waters of the Gulf."  Gulf FMP at 22.  Defendants' authority is limited to the conservation and sustainable management of fisheries.  In addition, there is no record support for the conclusion that the

Aquaculture FMP will "maximize benefits to the Nation," such as by "increas[ing] the maximum

sustainable yield (MSY) and optimum yield (OY) of federal fisheries in the Gulf," *id.* Second,

aside from the problem of the agency's lack of authority, the stated "purpose and need" is too

narrow to have allowed for the appropriate consideration of reasonable alternatives — the heart

of the NEPA process.   The statement therefore foreordained that an alternative will be chosen

that favors the development of commercial aquaculture.

      60.    The consideration of environmental impacts in the Gulf FMP/PEIS is insufficient

under NEPA, *see* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.1, 1502.5, because it fails

to assess several environmental and socioeconomic impacts of aquaculture.   For example,

Plaintiff Food & Water Watch in particular raised serious concerns about contamination and

pollution from mercury, nitrogen and phosphorous; escapes of farmed fish; disease and parasites

from farmed fish; effects on fish used as feed; human health impacts from antibiotics,

medications, and contaminants (including mercury, ciguatera, and PCBs) that people could suffer

through consumption of farmed fish or wild fish exposed to aquaculture operations; other harm

to the benthic, water quality, and aquatic ecosystems of the Gulf.   The Gulf FMP/PEIS does not

adequately assess these impacts, among others, as described in paragraph 36.

      61.    Further, the Gulf FMP/PEIS does not take the required "hard look" at cumulative

impacts on the physical, biological, and ecological environment that the Gulf FMP is likely to

have by permitting aquaculture to operate for the first time in the Gulf of Mexico. *See* 40 C.F.R.

§ 1508.7. For example, the Gulf FMP/PEIS does not adequately address the other activities in

the region likely to affect the fishery resources, from increased boat traffic to the processing or

transport of aquacultured fish, to the harm to species used as food for farmed fish or that

inadvertently may become prey. The Gulf FMP/PEIS also does not sufficiently discuss the

likelihood of new "dead zones" that aquaculture and resulting ocean pollution could affect or create, or the likely impacts on foraging wild fish, such as sardines, menhaden, and anchovies that could be used as feed for farmed fish.

62.     The Gulf FMP/PEIS also fails to address most of the scientific data submitted by commenters, including peer-reviewed literature on which the PEIS should have relied, in violation of NEPA's direction to rely on "high quality" and "accurate scientific information." 40 C.F.R. § 1500.1(b). The Gulf FMP/PEIS conclusions regarding minimal impact are not supported by the necessary scientific data. In addition, although there are some issues where scientific information was lacking, such as the risk of entanglement to certain species like sharks and federally listed sea turtles, where the Gulf FMP/PEIS recognizes the need for additional information by requiring inspection and monitoring of such occurrences, Defendants did not fulfill their obligation to obtain necessary information to make a reasoned decision to address this issue in advance, rather than after the fact. *Id.* § 1502.22 (requiring agency to take steps if this is unavailable).

63.     The discussion of alternatives is also incomplete, arbitrary and capricious. 42 U.S.C. § 4332(C)(iii) & (E); 40 C.F.R. § 1508.25. Because the premise of the Gulf FMP is to create a commercial aquaculture permitting scheme, the Gulf FMP/PEIS does not adequately consider whether the best alternative may be to take no such action. Defendants failed to consider or respond with a reasoned explanation to significant comments raised by Plaintiffs and by EPA regarding likely environmental harm that will flow from the Gulf FMP. In view of the requirement that Defendants consult other agencies during the NEPA process, the failure to take EPA's concerns into account shows that the Gulf FMP/PEIS is arbitrary and capricious. *See* 42 U.S.C. § 4332(2)(C) (requiring effective consultation of appropriate federal agencies).

64.     Finally, the Gulf FMP/PEIS does not discuss potential or necessary mitigation measures raised by commenters sufficiently to inform the decisionmaking process or consider the full significance of the Gulf FMP in operation.  *See* 40 C.F.R. §§ 1502.14(F), 1502.16(h). The Gulf FMP instead has attempted to avoid addressing mitigation measures until the consideration of an individual application.  Further, although the FMP will require aquaculture facilities to be at least 1.6 nautical miles apart to prevent the spread of disease, the record does not support this requirement as the reasonably necessary distance or as an appropriate measure to avoid this impact.

**E.     Additional Allegations of Injury to Plaintiffs**

65.     Plaintiffs' members include individuals who use the waters of the Gulf of Mexico for recreational and commercial purposes including boating, fishing, scuba diving, swimming, and wildlife study, photography, and observation.  Plaintiffs regularly engage in and enjoy observing and studying wildlife in and around the Gulf of Mexico including wild fish and other species likely to be harmed by the Gulf FMP.  Plaintiffs' members use and enjoyment of the waters of the Gulf of Mexico will be harmed by aquaculture permitted under the Gulf FMP, both due to direct harm caused to the wildlife of the Gulf and its natural resources and by their exclusion from certain areas to be enclosed for commercial purposes.

66.     Plaintiffs' members also include individuals who engage in recreational and commercial fishing, and other activities in the Gulf that would be affected by aquaculture.  Those members who fish for wild species managed by the Gulf Council under other fishery management plans are likely to be harmed, and their fishing grounds, fishing yields, health and quality of the fish harvested, and fish market prices are likely to be modified, by the operation of new stationary aquaculture operations.

67.     Plaintiffs' members enjoy eating wild fish managed sustainably under existing fishery management plans in the Gulf of Mexico.   The health of available fish on the market, both wild and aquacultured, would be harmed both directly and indirectly by aquaculture operations via negative environmental impacts on wild fish and reduced product quality of farmed fish through use of drugs and other chemicals.   Plaintiffs' members who are Gulf fish consumers would also be harmed if aquacultured Gulf fish were sold on the market and supplanted wild fish or undermined their ability to identify, purchase and enjoy sustainably managed wild fish from their local region.

68.     Plaintiffs are likely to experience imminent harm from the change in the status quo created by the new Gulf FMP and the authorization of commercial aquaculture permitting program for the first time.   The Gulf FMP would allow large-scale commercial aquaculture fish farms, with a yearly production of up to 64 million pounds of fish, to install facilities and operate in the Gulf.

69.     Plaintiffs' aesthetic, recreational, and professional interests, their ability to have information about and ensure the health of fish that they and their families eat, and their ability to continue to visit, observe, and enjoy the wild species and natural resources of the Gulf, depend upon the survival, health, and well-being of the natural resources, wild fish and other species in the Gulf, and the Gulf's aquatic ecosystems that are likely to experience immediate and significant harm from the permitting of commercial aquaculture under the Gulf FMP.

70.     Plaintiffs also experience additional harm due to Defendants' failure to take any of the necessary actions required by section 1854(a)(3) of the Magnuson Act because this failure undermines Plaintiffs' ability to receive information about, comment on, and potentially challenge any such action, and also harms their ability to advocate effectively with the

appropriate decisionmakers regarding a preferred outcome.  The failure of the Defendants to take action as required by law also harms Plaintiffs' ability to continue to participate in the process mandated by the Magnuson Act once the Defendants act, whatever form that action may take.

71.     For injuries caused by the Gulf FMP, Plaintiffs have no adequate remedy at law.

## VI.     CLAIMS FOR RELIEF

### CLAIM ONE

**(Defendants Failed to Perform a Legally Required Action
Under the Magnuson Act in Violation of the APA)**

72.     Plaintiffs reallege and incorporate by reference each and every allegation set forth above in this Complaint.

73.     The Magnuson Act required Defendants to approve, partially approve, or disapprove the Gulf FMP within 30 days of the end of the comment period.  *See* 16 U.S.C. § 1854(a)(3).

74.     Defendants took none of the required actions within 30 days of the end of the comment period for the Gulf FMP.   They did not approve, partially approve, or disapprove that FMP.

75.     To date, NMFS, NOAA, and the Secretary have not taken the discrete action required by section 304(a)(3) with respect to the Gulf FMP.

76.     Defendants have therefore unlawfully withheld action required by the Magnuson Act within the meaning of the APA, 5 U.S.C. § 706(1).

77.     The Defendants' failure to act has caused and continues to cause immediate harm to Plaintiffs.

## CLAIM TWO

**(Defendants' Decision to Allow the Gulf FMP to Take Effect
Was Ultra Vires in Violation of the APA and Magnuson Act)**

78.     Plaintiffs reallege and incorporate by reference each and every allegation set forth above in this Complaint.

79.     Defendants have no statutory authority to authorize commercial aquaculture or issue commercial aquaculture permits in federal waters, including permits that enclose or limit activities within areas of the Exclusive Economic Zone solely for aquaculture.

80.     The Magnuson Act does not grant aquaculture permitting authority to any of the Defendants explicitly or implicitly.

81.     It is a violation of the Magnuson Act and the APA, 5 U.S.C. § 706(2)(C), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "an abuse of discretion or not in accordance with law," *id.* § 706(2)(A), for the Defendants to fail to disapprove the Gulf FMP and to allow that FMP to take effect.

82.     The Defendants' decision to allow the Gulf FMP to take effect has caused and continues to cause immediate harm to Plaintiffs.

## CLAIM THREE

**(In the Alternative, Defendants' Decision to
Allow the Gulf FMP to Take Effect Violated the Magnuson Act and APA)**

83.     Plaintiffs reallege and incorporate by reference each and every allegation set forth above in this Complaint.

84.     The Gulf FMP is inconsistent with the Magnuson Act because the federal fisheries of the Gulf do not "require[] conservation and management" in the form of the Gulf FMP, 16 U.S.C. § 1853(a)(1)(A), and because the Gulf FMP will not protect but rather will likely harm wild fish species in the Gulf.

24

85.   The Gulf FMP is inconsistent with the Magnuson Act because it does not contain the required provisions of a fishery management plan identified in the Magnuson Act, including protection for EFH, overfishing requirements, and an appropriate fishery impact statement. *See id.* § 1853(a).

86.   The Gulf FMP is inconsistent with the national standards contained in the Magnuson Act, in particular with National Standards One, Two, Four, Five, Eight, and Nine. *See id.* § 1851(a)(1)-(2), (4)-(5), (8)-(9).

87.   Because the Gulf FMP is inconsistent with various Magnuson Act requirements, it was arbitrary and capricious and not in accordance with law under the APA, 5 U.S.C. § 706(2)(A), for the Secretary to allow it to take effect rather than disapproving it.

88.   The Defendants' decision to allow the Gulf FMP to take effect has caused and continues to cause immediate harm to Plaintiffs.

## CLAIM FOUR

### (In the Alternative, Defendants' Decision to Allow the Gulf FMP to Take Effect Violated NEPA)

89.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above in this Complaint.

90.   The Gulf FMP and accompanying PEIS violate NEPA, 42 U.S.C. § 4321, and the APA, 5 U.S.C. § 706(2)(A), because they include no assessment of several environmental and socioeconomic impacts or of numerous reasonable mitigation measures and alternatives to the plan to permit offshore aquaculture facilities in the Gulf.  They also violate various procedural and data analysis requirements of NEPA and its implementing regulations.

91.   The Gulf FMP/PEIS unreasonably defines the "purpose and need" for the proposed action in violation of NEPA. 40 C.F.R. § 1502.13.

92.     The Gulf FMP/PEIS does not include a "full and fair discussion of significant environmental impacts" required by 40 C.F.R. § 1502.1.  42 U.S.C. § 4332(C).

93.     The Gulf FMP/PEIS does not satisfy the NEPA requirement that data be of "high quality" and that the agency "insure the professional integrity, including the scientific integrity, of the discussions and analyses" in the EIS. 40 C.F.R. § 1500.1(b).  The Gulf FMP/PEIS relies in part on a statement that there are insufficient data available, but Defendants have not followed requisite procedure to compile necessary information for assessment.  40 C.F.R. § 1502.22.

94.     The Gulf FMP/PEIS does not include the necessary cumulative impact analysis. 40 C.F.R. § 1508.25; 40 C.F.R. § 1508.7.

95.     In the Gulf FMP/PEIS, Defendants have not considered and addressed reasonable alternatives or mitigation measures.  40 C.F.R. § 1502.14.

96.     The Defendants' decision to allow the Gulf FMP to take effect without complying with NEPA has caused and continues to cause immediate harm to Plaintiffs.

## VII.    REQUEST FOR RELIEF

THEREFORE, Plaintiffs respectfully request that the Court:

(1)     Declare that Defendants' failure to take action required by section 304, 16 U.S.C. § 1854(a)(3), is a violation of the Magnuson Act and constitutes action unlawfully withheld under the APA, 5 U.S.C. § 706(1);

(2)     Declare that Defendants' decision to allow the Aquaculture FMP to take effect is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under the APA, 5 U.S.C. § 706(2)(C), not in accordance with law under 5 U.S.C. § 706(2)(A), and in violation of the Magnuson Act;

(3)     Declare that Defendants' decision to allow the Aquaculture FMP to take effect is arbitrary, capricious, and not in accordance with law, pursuant to the APA, 5 U.S.C. § 706(2)(A),

because the FMP does not satisfy the requirements for fishery management plans under the Magnuson Act, including the National Standards of the Magnuson Act, 16 U.S.C. § 1851(a);

(4)     Declare that the decision to allow the Aquaculture FMP to take effect based upon the PEIS is arbitrary, capricious, and not in accordance with law, in violation of NEPA, § 4332(2)(C), accompanying regulations, and the APA, 5 U.S.C. § 706(2)(A);

(5)     Vacate the Gulf FMP;

(6)     Vacate Defendants' decision to allow the FMP to take effect;

(7)     Order Defendants to take action unlawfully withheld under the Magnuson Act, section 304(a)(3), 16 U.S.C. § 1854(a)(3), by disapproving, approving, or partially approving the FMP;

(8)     Order Defendants to disapprove the Gulf FMP on remand;

(9)     Enjoin Defendants from approving the Gulf FMP based upon the PEIS;

(10)    Retain jurisdiction of this action to ensure compliance with the Court's decree;

(11)    Award Plaintiffs the costs of this action, including attorney's fees, under 28 U.S.C. § 2412(d);

(12)    Grant such other and further relief as the Court deems just and proper.


RESPECTFULLY SUBMITTED this 2nd day of October, 2009,

Stephen E. Roady
D.C. Bar No. 926477
Earthjustice
1625 Massachusetts Avenue, N.W.
Suite 702
Washington, D.C. 20036
(202) 667-4500
*Counsel for Gulf Restoration Network, Inc.*

Zach Corrigan /by permission
Zach Corrigan
D.C. Bar No. 497557
1616 P Street, NW, Suite 300
Washington, DC 20036
(202) 683-2451
*Counsel for Food & Water Watch*