UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GULF RESTORATION NETWORK,    :
INC., <u>et al.</u>,               :
                              :
        Plaintiffs,           :
                              :
    v.                        :    Civil Action No. 09-1883 (GK)
                              :
NATIONAL MARINE FISHERIES,    :
SERVICE, <u>et al.</u>,            :
                              :
        Defendants.           :
_____:
                              :
OCEAN CONSERVANCY,            :
                              :
        Plaintiff,            :
                              :
    v.                        :    Civil Action No. 09-1884 (GK)
                              :
NATIONAL MARINE FISHERIES     :
SERVICE, <u>et al.</u>,            :
                              :
        Defendants.           :

<u>MEMORANDUM OPINION</u>

Plaintiffs Gulf Restoration Network, Inc., Food & Water Watch, and Ocean Conservancy (collectively, "Plaintiffs") brought this action against Defendant National Marine Fisheries Services ("NMFS"), James W. Balsiger, National Oceanic and Atmospheric Administration, and Gary Locke, United States Secretary of Commerce (collectively, "Defendants"), alleging that the Fishery Management Plan for Regulating Offshore Marine Aquaculture in the Gulf of Mexico violates provisions of the Magnuson-Stevens Fishery and Conservation Management Act and the National Environmental Policy Act.

This matter is before the Court on Defendants' Motion to Dismiss [Dkt. No. 8] for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and failure to state a claim for which relief can be granted pursuant to Rule 12(b)(6). Upon consideration of the Motions, Opposition, Reply, and the entire record herein, and for the reasons stated below, NMFS' Motion to Dismiss is **granted**.

## I.    BACKGROUND

### A.    Statutory Background

Plaintiffs allege violations of the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801 et seq., the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4337 et seq., and the Administrative Procedure Act ("APA") 5 U.S.C. § 702 et seq.

The Department of Commerce, through NMFS,[1] regulates the nation's marine fisheries, pursuant to the MSA. The MSA establishes eight Regional Fishery Management Councils composed of federal officials, state officials, and private parties that are appointed by the Secretary of Commerce. 16 U.S.C. § 1852. These Councils are responsible for developing fishery management plans

---

[1]    NMFS is the agency within the Department of Commerce's National Oceanic and Atmospheric Administration ("NOAA") to which NOAA has delegated authority and stewardship duties of fisheries management under the MSA. Compl. ¶¶ 9-10. The Secretary of Commerce acts through the NMFS to implement fishery management plans. Defs.' Mot. at 4; 16 U.S.C. § 1855(d).

("FMPs" or "Plans") for fisheries in federal waters within the United States Exclusive Economic Zone ("EEZ"), id. at § 1853, which includes ocean water from three to two hundred miles offshore.

Once a Council has developed a Plan, the MSA requires that the Secretary of Commerce review it. The Secretary must determine whether the FMP comports with ten national standards provided for in the MSA, as well as "any other applicable law." Id. at §§ 1854, 1851 (setting forth national standards). Additionally, the Secretary must "immediately publish in the Federal Register a notice stating that the plan . . . is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published." Id. at § 1854(a)(1)(B).

The MSA then instructs that the Secretary shall "approve, disapprove, or partially approve a plan or amendment within 30 days of the end of the comment period . . . by written notice to the Council." Id. at § 1854(a)(3). The Act also contemplates a scenario where the Secretary does not approve or disapprove the FMP: "If the Secretary does not notify a Council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment shall take effect as if approved." Id. In other words,

if the Secretary fails to act, the FMP automatically becomes effective.

At the same time the Council submits its FMP to the Secretary, it also submits regulations for its implementation to the Secretary. Id. at § 1853(c). The Secretary then must conduct a review of the regulations which is similar to that conducted for the Plan--i.e. determine consistency with national standards, applicable law, and the FMP. Before the regulations become final, the MSA requires that the "Secretary shall notify the Council in writing of [any] inconsistencies and provide recommendations on revisions that would make the proposed regulations consistent with the fishery management plan, plan amendment, this chapter, and other applicable law." Id. at § 1854(b)(1)(B). Unlike the procedure governing adoption of the FMP, the MSA contains no provision that allows the regulations to take effect by operation of law if the Secretary takes no action. See id. at § 1854(b)

**B.   Factual Background**

One of the eight Councils, the Gulf of Mexico Fishery Management Council ("Gulf Council"), drafted the FMP at issue in this case to authorize commercial offshore aquaculture facilities in the Gulf of Mexico's EEZ. The Gulf Council approved the FMP on January 27, 2009. Decl. of Kevin W. McCardle [Dkt. No. 9], Ex. 2

at 1.[2]  It sets forth a plan for a regional permitting process for commercial offshore aquaculture in federal waters.  Id. at 1-2. The Council submitted its proposed regulations to NMFS with its FMP on February 24, 2009.  Id. at Cover.  The comment period began the day the notice was published, which was June 4, 2009, and closed August 3, 2009.[3]  Id.  NMFS had 30 days, or until September 2, 2009, id., to approve, partially approve, or disapprove the FMP by written notice to the Council.  16 U.S.C. § 1854(a)(3).

Offshore aquaculture is the farming of aquatic animals in open ocean areas, most often through the use of floating or submerged net-pens or cages.  McCardle Decl., Ex. 1 at 15.  If the Council's FMP is implemented, an estimated five to 20 offshore aquaculture operations would be permitted over the next ten years, with an estimated annual production of up to 64 million pounds of fish. Id. at 1.  The Council cites an increase in demand for protein and

---

[2]  On September 23, 2009, Kevin W. McCardle, Department of Justice counsel for Defendants, submitted a Declaration attaching four exhibits.  [Dkt. No. 9]  Exhibit 1 contains excerpts from the Aquaculture FMP.  Exhibit 2 is a September 3, 2009, letter from NMFS to the Gulf of Mexico Fishery Management Council.  Exhibit 3 is a September 3, 2009, press release issued by Defendants. Exhibit 4 is a list of "Frequently Asked Questions," along with answers to those questions, downloaded from Defendants' website (http://sero.nmfs.noaa.gov/sf/pdfs/Aquaculture%20FAQs% 202009-09.pdf).  The Court will cite these documents as "McCardle Decl., Ex. # at #."

[3]  Food & Water Watch submitted comments on the FMP on August 3, 2009, and a joint comment with Gulf Restoration Network on July 31, 2009.  Ocean Conservancy submitted comments on August 3, 2009.

seafood as the justification for this proposed change to aquaculture from "commercial wild-capture fisheries [that] are being fished at or above sustainable levels and are likely unable to meet such growing demand." Id.

The FMP submitted by the Gulf Council incorporated a Programmatic Environmental Impact Statement ("PEIS"). The lengthy document presented ten discrete actions that would comprise the aquaculture plan. See id. at 25-101 (discussing, inter alia, requirements for permits, applications, durations of the permits, siting requirements, and recordkeeping and reporting). For each proposed action, the FMP analyzed three management alternatives that described how each action could be implemented. Id. at 10-14 (summarizing actions and alternatives). The relevant portions of the Council's preferred version of the FMP are summarized as follows:

1.  An aquaculture permit would be required for conducting offshore marine aquaculture. Such a permit would authorize the deployment and operation of an offshore aquaculture facility and the sale of allowable aquaculture species. Dealer permits are required in order to receive cultured organisms and are non-transferable. Aquaculture permits are transferable (except under limited conditions) and eligibility is limited to United States citizens and permanent resident aliens.

2.  Application and operational requirements, as well as permit restrictions would be established. Some application requirements include submitting an application, providing general contact information, descriptions of systems and equipment, site location coordinates, and an emergency disaster plan. Operational requirements include a use-it-

or-lose-it provision, documentation that broodstock are marked or tagged at the hatchery, certification that animals are pathogen free, and various monitoring requirements. The use of drugs, biologics, and pesticides must be in compliance with federal agency regulations.

3.    An aquaculture permit would be effective for ten years and may be renewed in five-year increments.

4.    The aquaculture of all species native to the Gulf and those listed in the aquaculture fishery management unit would be allowed, with the exception of shrimp and corals.

McArdle Decl., Ex. 1 at 10-13.

Before a permit application is approved, a Regional Administrator ("RA") must review it and make a preliminary determination as to whether it merits further consideration. See id. at viii, 2. If so, notice of the application is published in the Federal Register, along with notice of NOAA's intent to grant the permit. There is then a comment period of 15-45 days, during which members of the public may testify at a Council meeting. The applicant also has an opportunity to appear at a Council meeting. When the public comment period ends, the RA notifies the applicant of the decision to grant or deny the permit, provides reasons for that decision, and publishes notice of approval or disapproval in the Federal Register. Id. at 2.

Additionally, the EPA and Army Corps of Engineers ("Corps") have some responsibility over permitting offshore aquaculture. Id. at 246, 251-52. In order to proceed with an aquaculture operation, an applicant must obtain a permit for the construction of offshore

aquaculture facilities from the Corps, pursuant to the Rivers and Harbor Act. See 33 U.S.C. § 403; id. at 246. Under the Clean Water Act, 33 U.S.C. § 1328, the EPA has the authority to grant or deny discharge permits for aquaculture operations. Both permitting processes include a public notice and comment period. See McCardle Decl., Ex. 1 at 251-52.

On September 3, 2009, the Fishery Management Plan for Regulating Offshore Marine Aquaculture in the Gulf of Mexico ["the FMP" or "the Aquaculture FMP"] took effect by operation of law. Pursuant to § 1854(a) of the MSA, the Gulf Council submitted its completed FMP and proposed regulations to NMFS for Secretarial review. 16 U.S.C. § 1854(a). Upon receipt of the FMP, NMFS immediately commenced review of the plan to determine if it was consistent with the ten national standards for fishery conservation and management, other provisions of the MSA, and any other applicable law. Id. at § 1854(a)(1)(A).

As noted earlier, if NMFS decides to partially approve or disapprove an FMP, it must follow the procedure outlined in §§ 1854(a)(3)(A-C). In this case, NMFS took the "unprecedented approach" of not following this process. McCardle Decl., Ex. 2 at 1. Instead it took no action, thereby invoking the MSA provision that states:

> If the Secretary [i.e. NMFS] does not notify a Council within 30 days of the end of the comment period of the approval, disapproval, or partial approval of a plan or amendment,

-8-

then such plan or amendment shall take effect
as if approved.

16 U.S.C. § 1854(a)(3).  Thus, the FMP took effect by operation of
law on September 3, 2009, as a result of the Secretary's inaction.

On September 3, 2009, NMFS wrote a letter to the Council
explaining why it had not acted on the FMP within the 30-day
statutory period.  NMFS explained that the scope of the FMP went
far beyond any aquaculture measures previously submitted and that
it raised "important issues of national policy regarding the manner
in which offshore aquaculture is regulated in the EEZ."  See
McCardle Decl., Ex. 2 at 1-2.  Given the broad scope of the FMP,
NMFS advised the Council that "it was not prudent to take action on
the FMP in the absence of a comprehensive national policy" that
could foster the development of environmentally sound offshore
aquaculture operations.  See id.  NMFS explained:

> As we develop a national policy, we will also
> examine the Plan in the context of that
> policy.  If we determine the Plan is
> inconsistent with that policy, we will
> consider appropriate action, which could
> include seeking amendment or withdrawal of the
> [P]lan through the Magnuson-Stevens Act. Id.

That same day NMFS issued a press release publicly announcing
its intent to develop such a national policy and stated that
although the FMP had taken effect, regulations must be published
before permits could be issued.  McCardle Decl., Ex. 3 at 1.B.

**B. Procedural History**

On October 2, 2009, Plaintiffs filed two similar lawsuits alleging violations of the MSA, NEPA, and the APA. The Court consolidated the two lawsuits on November 10, 2009. Order (Nov. 10, 2009)[Dkt. No. 6].

The Complaints allege four claims against NMFS. Claim One alleges that NMFS' failure to approve, disapprove, or partially approve the Aquaculture FMP within 30 days, as provided for by 16 U.S.C. § 1854(a)(3), constitutes unlawfully withheld agency action under the MSA and APA. Compl. ¶¶ 72-77. Claim Two alleges that NMFS' decision to allow the Aquaculture FMP to take effect under 16 U.S.C. § 1854(a)(3) was <u>ultra vires</u> under the MSA and APA. <u>Id.</u> ¶¶ 78-82. Claims Three and Four allege that NMFS' decision to allow the Aquaculture FMP to take effect was unlawful because the FMP violates substantive provisions of the MSA and procedural requirements of NEPA.[4] <u>Id.</u> ¶¶ 83-88; 89-96. Plaintiffs seek declaratory and injunctive relief.

On November 23, 2009, Defendants filed a Motion to Dismiss Plaintiffs' Complaints for lack of subject matter jurisdiction

---

[4] NEPA requires federal agencies to fully consider and disclose the environmental consequences of an agency action. 42 U.S.C. § 4332(2)(c). NEPA requires that an agency prepare an environmental impact statement ("EIS") for major federal actions that significantly affect the quality of the human environment. Id. "Other statutes may impose substantive environmental obligations on federal agencies, . . . but NEPA merely prohibits uninformed-- rather than unwise--agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989).

pursuant to Rule 12(b)(1), and, in addition or in the alternative, for failure to state a claim for which relief can be granted pursuant to Rule 12(b)(6). Defs.' Mot. at 1. Defendants argue that Plaintiffs' Complaints should be dismissed because (1) Plaintiffs lack Article III standing; (2) Plaintiffs' claims are unripe; and (3) Plaintiffs lack a statutory cause of action through which Congress has waived sovereign immunity. Id. at 1.

Plaintiffs filed an Opposition to Defendants' Motion on December 11, 2009, claiming that (1) Plaintiffs have Article III standing; (2) Plaintiffs' claims are ripe; and (3) Plaintiffs have statutory causes of action in which Congress has waived sovereign immunity. Pls.' Opp'n to Defs.' Mot. ("Pls.' Opp'n") at 1 [Dkt. No. 11]. Defendants filed their Reply in Support of their Motion to Dismiss on December 18, 2009. Defs.' Reply Memorandum in Support of Defs.' Mot. ("Defs.' Reply") [Dkt. No. 14].

## II. STANDARD OF REVIEW

Defendants ask the Court to dismiss the Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6). Under Rule 12(b)(1), the plaintiff bears the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction to hear the case. See Khadr v. United States, 529 F.3d 1112, 1115 (D.C. Cir. 2008). In reviewing a motion to dismiss for lack of subject matter jurisdiction, the Court must accept as true all of the factual allegations set forth in the Complaint; however, such allegations

warrant closer scrutiny when resolving a 12(b)(1) motion than when resolving a 12(b)(6) motion. See Macharia v. United States, 334 F.3d 61, 64 (D.C. Cir. 2003). The Court may consider matters outside the pleadings. See Herbert v. Nat'l Acad. of Sciences, 974 F.2d. 192, 197 (D.C. Cir. 1992). The Court may rest its decision on the Court's own resolution of disputed facts. Id.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge [] [his or her] claims across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563.

Under the Twombly standard, a "court deciding a motion to dismiss must not make any judgment about the probability of the plaintiff's success . . . the court must assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged."[5] Aktieselskabet AF 21. November

_____

[5]    As noted, supra at n. 2, Defendants included a Declaration from counsel with four exhibits. Plaintiffs submitted additional material as part of counsel Stephen E. Roady's Declaration [Dkt. No. 12]. The exhibits to the Roady Declaration included declarations from four members of Plaintiff-organizations, a complete copy of the Aquaculture FMP, and copies of Plaintiffs' comment letters filed in response to the Aquaculture FMP. Roady Decl. at 2. All of the documents in Defendants' Declaration were
(continued...)

2001 v. Fame Jeans Inc., 525 F.3d 8, 17 (D.C. Cir. 2008) (internal quotation marks and citations omitted).

Pursuant to the APA, an agency decision must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 702(2)(A). "The arbitrary and capricious standard [of the APA] is a narrow standard of review." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). It is well established in our Circuit that "[t]his court's review is . . . highly deferential" and "we are 'not to substitute [our] judgment for that of the agency' but must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Bloch v. Powell, 348 F.3d 1060, 1070 (D.C. Cir. 2003) (citations and internal quotation marks omitted); see also United States v. Paddack, 825 F.2d 504, 514 (D.C. Cir. 1987).

If the "agency's reasons and policy choices . . . conform to 'certain minimal standards of rationality' . . . the [agency

(...continued)
referred to in the Complaint. The same is true for the final three exhibits to Plaintiffs' Declaration (the four individual declarations are relevant only to the jurisdictional inquiry). Therefore, the Motion to Dismiss under Rule 12(b)(6) need not be evaluated under a summary judgment standard. See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997); Marshall v. Honeywell Tech. Solutions Inc., 536 F. Supp. 2d 59, 65 (D.D.C. 2008) (stating that "where a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment").

decision] is reasonable and must be upheld." <u>Small Refiner Lead Phase-Down Task Force v. EPA</u>, 705 F.2d 506, 521 (D.C. Cir. 1983) (citation omitted); <u>see</u> <u>Kisser v. Cisneros</u>, 14 F.3d 615, 619 (D.C. Cir. 1994).

## III. **ANALYSIS**

In their Motion to Dismiss, Defendants argue that the Court lacks subject matter jurisdiction and Plaintiffs fail to state a claim upon which relief can be granted.  They advance three primary reasons for their position.  First, Defendants claim that Plaintiffs lack Article III standing because they suffered no actual or imminent injury attributable to the Aquaculture FMP. Defs.' Mot. at 14.  Second, Defendants argue that Plaintiffs' claims are unripe because NMFS' agency action is not final and no aquaculture has been permitted or taken place; therefore, no injury has occurred and the matter is unfit for judicial review. <u>Id.</u> at 21-22.  Third, Defendants argue that Plaintiffs cannot rely on the MSA or the APA, as neither waives sovereign immunity to provide Plaintiffs with a cause of action in the instant case.  <u>Id.</u> at 26-30.

### A.   **Plaintiffs Do Not Have Standing to Challenge Defendants' FMP.**

Article III of the Constitution "confines the federal courts to adjudicating actual 'cases' and 'controversies.'"  <u>Allen v. Wright</u>, 468 U.S. 737, 750 (1984).  Because standing is an element of the case or controversy requirement, a court does not have

subject matter jurisdiction if a plaintiff lacks standing.  See In re Navy Chaplaincy, 534 F.3d 756, 759 (D.C. Cir. 2008).  ("One of the controlling elements in the definition of a case or controversy under Article III is standing.") (quoting Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 598 (2007)); see Boston & Maine Corp. v. Surface Transp. Bd., 364 F.3d 318, 319 (D.C. Cir. 2004) (when a plaintiff lacks standing, the court lacks subject matter jurisdiction).

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977).  Plaintiffs invoke federal jurisdiction, and therefore bear the burden of showing that they have standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  To do so, Plaintiffs may establish either substantive or procedural standing.  See Nat'l Parks Conservation  Ass'n v. Manson, 414 F.3d 1, 4-5 (D.C. Cir. 2005).  "[W]hen," as here, "the [party] is not [herself or himself] the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." Lujan, 504 U.S. at 562.

### 1. Substantive Standing

In <u>Lujan</u>, 504 U.S. 555, 560-61 (1992), the Supreme Court established that the following three elements are required for substantive standing:

> First, the plaintiff must have suffered an "injury in fact"--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. at 560-61 (internal citations omitted). Defendants challenge only the first element, namely that there is no injury in fact. Defs.' Mot. at 3.

Plaintiffs assert that they will suffer imminent injury because the FMP has "become operational" by default. Pls.' Opp'n at 14-15. Plaintiffs' affidavits enumerate the types of harm they as individuals expect to incur. For example, Louis Skrmetta, a member and director of Gulf Restoration Network, claims that, "[i]ndividually and combined, aquaculture facilities in the Gulf of Mexico will hurt [his] personal interest in the well-being of the Gulf, as well as [his] business by damaging the ecosystem and harming wild fish populations." Skrmetta Decl. at ¶ 2. Defendants

maintain that Plaintiffs' hypothetical injuries amount to mere contingencies and, accordingly, fail to establish standing.  Id.

Aquaculture has not taken place in the Gulf of Mexico pursuant to the FMP.  The FMP neither forbids nor requires any action on the part of parties.  Most importantly, several steps must be taken before any concrete harm to Plaintiffs could possibly result from the FMP.  Such steps include: approval of regulations by NMFS, adoption of regulations, approval of permits by the various government bodies on a case-by-case basis, and regulation of the location of aquaculture sites by NMFS, the Army Corps of Engineers, and the EPA.  See supra at I.B.  The  FMPs alone do not have any regulatory effect because implementing regulations must be approved in order to effectuate them.  16 U.S.C. § 1854(b)(1); see N.C. Fisheries Ass'n v. Gutierrez, 550 F.3d 16, 17 (D.C. Cir. 2008) ("[Fishery management p]lans . . . do not themselves have any regulatory effect--implementing regulations must also be enacted in order to effectuate them."); Hall v. Evans, 165 F. Supp. 2d 114, 143 (D.R.I. 2001) ("It is the Secretary of Commerce, and not the Councils, who is authorized to promulgate a regulation.").  In the instant case, therefore, the fact that the Aquaculture FMP took effect by operation of law does not mean that aquaculture is ongoing in the Gulf of Mexico.

Plaintiffs' own declarations and arguments demonstrate that no harm is particularized or imminent.  Cf. Lujan, 504 U.S. at 560-61

(Court examined declarations submitted by plaintiffs to determine whether standing existed). For instance, in describing the potential threat presented by acquaculture, Skrmetta states that because the FMP, if implemented, "will authorize aquaculture facilities and operations to exercise exclusive use of certain areas of the Gulf of Mexico," he and others will be barred from "even traveling through those areas." Skrmetta Decl. at ¶10. Similarly, Tracy Redding, a member of Ocean Conservancy, claims that the FMP would injure her interests. However, her concerns, like Skrmetta's, are not imminent and particularized, but are dependent upon a chain of events that might occur "if aquaculture goes forward," since the FMP "facilitates development of open ocean aquaculture which is expected" to lead to injurious impacts. Redding Decl. at ¶¶ 5-6. Additionally, Plaintiffs in their Opposition state that "[m]embers 'suffer[] a cognizable injury from environmental damage,' to these waters that aquaculture is <u>likely</u> to create." Pls.' Opp'n at 14 (citations omitted)(emphasis added). They claim that the FMP is a "first step" for "commercial aquaculture operations to commence," and their declarations focus on injuries that they "expect to suffer." Id. at 4-6. Even Plaintiffs' description of the injury they "expect to suffer" suggests that the harm is conjectural, rather than imminent.

Our Court of Appeals has concluded that an injury is not "actual, imminent, or 'certainly impending'" for standing purposes

where a party "can only aver that any significant adverse effects . . . 'may' occur at some point in the future." Ctr. for Biological Diversity v. U.S. Dep't of Interior, 563 F.3d 466, 478 (D.C. Cir. 2009) (hereinafter "CBD"). The injury in this case is just as conjectural as that described in CBD. In that case, an oil and gas leasing program was in the first step of a multi-stage statutory process. Id. at 479. The Court found that petitioners failed to establish standing because their alleged injury from climate change was too general. Id. at 478. The Court held that petitioners relied on too tenuous a causal link between their allegations of climate change and the first stage of the leasing program.[6] Id. Plaintiffs' claims in the instant case are equally general and attenuated since they describe possible future harms instead of concrete present injury.

Plaintiffs maintain that Defendants have "invent[ed] additional hurdles to review" in describing the permitting process undertaken by the EPA and Corps. Pls.' Opp'n at 16. Because the

---

[6] The CBD Court distinguished a recent Supreme Court case, on which Plaintiffs rely, that dealt with standing in environmental lawsuits. In Massachusetts v. EPA, 549 U.S. 497 (2007), the Court held that the State of Massachusetts had standing to challenge the EPA's denial of a rule-making petition where the alleged injury was an increase in greenhouse gas emissions. 549 U.S. at 526. Our Court of Appeals noted that the Supreme Court relied heavily on the fact that a State, and not a private individual, was bringing the claim. CBD, 563 F.3d at 476. Additionally, the State itself, which owned a great deal of the land to be affected, had already been directly injured by the EPA's inaction in Massachusetts. Id. Neither of these two important factors are present in this case, and therefore Massachusetts does not further Plaintiffs' case.

FMP governs the siting and size of the aquaculture facility, Plaintiffs argue that approval by EPA and the Corps does not make the harm to Plaintiffs any less imminent. Id. This objection is without merit. The FMP requires that both agencies issue permits before aquaculture actually takes place. See supra at I.B. As such, the potential injury is more attenuated, because other agencies must act before any facilities can be constructed or begin operation. See Atl. States Legal Found. Inc., v. EPA, 325 F.3d 281, 285 (D.C. Cir. 2003) As the Court said in CBD, "[t]he more indirect the chain of causation between the government's conduct and the plaintiff's injury, the less likely the plaintiff will be able to establish . . . standing." CBD, 563 F.3d at 478.

Plaintiffs rely on American Oceans Campaign v. Daley, 183 F. Supp. 2d 1 (D.D.C. 2000), to support their position. In Daley, this Court found that plaintiffs had standing where essential fish habitat ("EFH") Amendments to regional FMPs failed to "adopt[] measures that would restrict fishing gear in order to minimize adverse effects of fishing related activities on EFH." Id. at 5. The Court found that NMFS' acts and omissions with respect to the EFH Amendments had caused Plaintiffs actual harm, thereby giving them standing to bring suit. Id. at 10.

Daley does not purport to say that the passing of any FMP or amendment thereto gives standing to those potentially in harm's way, regardless of how conclusory the allegations of that harm may

be.  Id.  Rather, Daley held that where an agency activity has caused "particularized injuries," those harmed will have standing. Id.  Whereas the EFH Amendments at issue in Daley regulated ongoing commercial fishing activity, the Aquaculture FMP merely constructs a framework within which Defendants may permit an entirely new activity that has yet to occur.  This fact makes mere approval of the Aquaculture FMP too far removed from harmful conduct to establish injury.

Article III simply does not grant power to courts to preempt potential harm that is neither actual nor imminent, and Plaintiffs therefore lack substantive standing to bring suit against Defendants.

### 2.  Procedural Standing

Gulf Restoration argues that Plaintiffs also have procedural standing to bring their challenges under NEPA and the MSA.  Pls.' Opp'n at 20.  They allege that by allowing the Aquaculture FMP to take effect by operation of law NMFS violated procedures set forth in each statute.  Id. at 21.

Plaintiffs have procedural standing "if [they] can show that an agency failed to abide by a procedural requirement that was 'designed to protect some threatened concrete interest of the plaintiff.'"  See CBD 563 F.3d at 479.  Such procedural omissions do not alone give standing to sue, but rather "a procedural-rights plaintiff must show not only that the defendant's acts omitted some

procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." See id. The Supreme Court has noted that when determining procedural standing, "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." Summers v. Earth Island Institute, 129 S. Ct. 1142, 1151 (2009); see WebCel Commc'n, Inc. v. FCC, 1999 WL 325450, at *1 (D.C. Cir. Apr. 28, 1999) ("To have standing to challenge an alleged procedural violation, a party must demonstrate that it has suffered an injury caused by the substantive action taken by the agency.").

Based on Summers, a procedural right without some attached concrete interest that is affected by a deprivation--what is called a procedural right "in vacuo"--is insufficient to establish Article III standing. Summers, 129 S. Ct. at 1151. Standing is appropriate when there is a "live dispute over a concrete application of those regulations." See id. at 1147. As discussed, the instant case does not present such a "live dispute." Plaintiffs have not yet suffered--and may never suffer--injury as a result of Defendants' action or inaction. Therefore Plaintiffs' claims do not, under Summers, provide grounds for procedural standing. See City of Orrville, Ohio v. FERC, 147 F.3d 979, 986 (D.C. Cir. 1998) ("Since plaintiffs lack standing to challenge [the agency's] substantive actions, they indeed lack standing to

challenge procedural defects in the process that produced those actions.") (quoting <u>Wilderness Soc'y v. Griles</u>, 824 F.2d 4, 19 (D.C. Cir. 1987)).

Plaintiffs seek to invoke <u>CBD</u> to show that procedural standing would apply in the instant case. However, procedural standing existed in CBD because the plaintiffs showed a threatened particularized interest and submitted affidavits detailing definitive dates as to when they would be deprived of the opportunity to observe potentially harmed species. 563 F.3d at 479. This supplemental detail was integral to the Court's ultimate determination because it helped outline how a procedural remedy would redress their harm. See id.

In the instant case, the Plaintiffs are not able to provide such detailed dates of injury, but rather put forth declarations of conjectural, potential future injuries. <u>See</u> Pls.' Opp'n at 4. For example, Michael Tad Burke, a member of Food & Water Watch, claims to have "serious expectation[s] that some customers will choose to go elsewhere" if the FMP takes effect. Decl. of Michael Tad Burke at ¶ 24. Obviously, this is pure conjecture; it does not supply any specific information; it does not describe any injury which is imminent; it does not describe any injury which actually exists. <u>See</u> <u>Lujan</u>, 504 U.S. at 560-61. Tim Adams, a member of Ocean Conservancy, discusses the impacts that he "expects" will occur if aquaculture takes place, including harms to aquatic life. Decl. of

Tim Adams at ¶ 4. In contrast, the affidavits in CBD identified their injuries, and included specific dates and species. For these reasons, because Plaintiffs cannot show injury in fact, they lack procedural standing to bring suit against Defendants.

**B. Plaintiffs' Claims Are Not Ripe for Adjudication.**

The primary rationale behind the ripeness requirement is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbott Laboratories v. Gardner, 387 U.S. 136, 148 (1967). Accordingly, the "ripeness doctrine is drawn both from [Constitutional] limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." Reno v. Catholic Soc. Serv., Inc., 509 U.S. 43, 57 n. 18 (1993). A claim must be both Constitutionally and prudentially ripe to be adjudicated. Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 48 (D.C. Cir. 1999).

Plaintiffs have alleged that their claims are both Constitutionally and prudentially ripe. Apart from alleging injury is imminent, Plaintiffs maintain that because "the Gulf FMP is now final, [it] will govern and predetermine virtually all of the content of the final regulations and permitting framework." Pls.' Opp'n at 24. To Plaintiffs, the FMP represents the outer limits of any future implementing regulations, and as such, is effectively a regulation itself. In short, the Aquaculture FMP as a form of

agency action is, in their view, sufficiently final to satisfy all ripeness requirements.  Pls.' Opp'n at 24-25.  Defendants respond that NMFS' agency action is not final in part because the FMP and the regulations are distinct.  Plaintiffs therefore could not have been injured, nor is it certain that they will be in the future. Defs.' Mot. at 22.  Defendants view the non-finality issue as dispositive with respect to the ripeness of Plaintiffs' claims. Id. at 23.

### 1.   Constitutional Ripeness

"Article III does not allow a litigant to pursue a cause of action to recover for an injury that is not 'certainly impending.'" Wyo. Outdoor Council, 165 F.3d at 48 (quoting Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1427 (D.C. Cir. 1996)).  Like the Article III case and controversy requirements for standing, a plaintiff must also suffer present or imminent injury in fact to establish Constitutional ripeness.  See  Wyo. Outdoor Council, 165 F.3d at 48 ("Just as the [C]onstitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury.").  As discussed above, Plaintiffs have demonstrated neither actual injury in fact, nor that harm is imminent.  See supra at III.A.1.  Plaintiffs' claims therefore are not Constitutionally ripe.

## 2. Prudential Ripeness

Courts apply a two-prong test to determine whether a case is ripe for adjudication. See Abbott Laboratories, 267 U.S. at 149. First, a court must evaluate the "fitness of the issue for judicial decision" and second, "the hardship to the parties of withholding court consideration." Id. Courts balance these two factors when deciding whether a case is ripe for adjudication. Id.

When considering fitness, courts must ask if the issue "is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." Atl. States Legal Found. Inc., v. EPA, 325 F.3d 281, 284 (D.C. Cir. 2003) (hereinafter "Atlantic States") (quoting Clean Air Implementation Project v. EPA, 150 F.3d 1200, 1204 (D.C. Cir. 1998)).

Plaintiffs make the following claims in their Complaint: (1) that NMFS has "unlawfully withheld action required by the Magnuson Act"; (2) that NMFS has "no statutory authority to authorize commercial aquaculture or issue commercial aquaculture permits in federal waters"; (3) that the Gulf FMP is "arbitrary and capricious" because it is inconsistent with the MSA; and (4) that "the Gulf FMP and accompanying PEIS violate NEPA, the APA and various procedural and data analysis requirements of NEPA and its implementing regulations." Pls.' Compl. ¶¶ 72-96. "Claims that an agency's action is arbitrary and capricious or contrary to law

present purely legal questions." Atlantic States, 325 F.3d at 284. Each of Plaintiffs' arguments represent a purely legal claim.

However, "even purely legal issues may be unfit for review." Atlantic States, 325 F.3d at 284. The other factors of the fitness requirement must also be taken into account. The second of these factors requires that the setting at the time suit is brought be sufficiently concrete to resolve the issue. Id. Our Court of Appeals has held that judicial "[r]eview is inappropriate when the challenged policy is not sufficiently fleshed out to allow the court to see the concrete effects and implications of its decision or when deferring consideration might eliminate the need for review altogether." Chamber of Commerce of the U.S. v. Reich, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (citations and internal quotations omitted).

In the current case, the process prescribed by the MSA with respect to FMP implementation has not been satisfactorily "fleshed out." NMFS has yet to promulgate regulations or actually allow any aquaculture to proceed. Not only is the process incomplete, but also, as previously discussed, several of the remaining steps could result in drastically different outcomes including the denial of any and all aquaculture permits. McArdle Decl., Ex. 1 at 10-13 (explaining proposed alternative procedures for the permitting process). Plaintiffs' exposure to harm relates directly to these

results.  If aquaculture is denied altogether in the Gulf, injury to Plaintiffs will not even be a possibility.

In support of their claims, Plaintiffs allege that "the Gulf FMP _threatens_ a broad range of Plaintiffs' members' particularized interests causing injury in fact."  Pls.' Opp'n at 10 (emphasis added).  Indeed, Plaintiffs frequently use the word "likely" to describe the harm in question, recognizing the tenuous nature of their claims.  For example, they argue that "the harm to the Gulf of Mexico ecosystem that is _likely_ to attend open ocean aquaculture operations would adversely affect Plaintiffs' members."  _Id._ at 4 (emphasis added).

In addition, Plaintiffs submitted declarations attempting to enumerate the types of harm they as individuals expect to incur. See supra at III.A.1.  The present setting, however, is not sufficiently concrete because not only has injury not yet occurred, but future injury is not imminent.  Michael Tad Burke claims that his job as a professional fishing guide gives him an economic interest in the well-being of the aquatic life in the Gulf.  While he is firm about the effects that acquaculture "will" have, Decl. of Michael Tad Burke at ¶¶ 13-16,  the list of injuries does not describe impacts particular to him, but asserts the effects that aquaculture in general may have.  Tracy Redding, a member of Ocean Conservancy, speculates that the FMP could mean that she "would not enjoy consuming fish produced by aquaculture to the same degree"

and that she "would lack information to determine if [she] were eating farmed fish or wild-caught fish if aquaculture goes forward." Decl. of Tracy Redding at ¶ 5. These injuries are far from concrete. Not only do they rely on the operation of aquaculture that is not yet even permitted by regulation, but we do not know what such future regulations might require regarding information to consumers.

As in _Atlantic States_, these claims are not sufficiently fleshed out to demonstrate ripeness. In that case, the EPA adopted regulations permitting New York State utility companies to accumulate hazardous waste without first obtaining a permit. 325 F.3d at 282. Before these regulations took effect, New York had to adopt EPA's regulations subject to public notice and comment. Additionally, the utility companies were not required to participate in the regulatory scheme. Our Court of Appeals found _sua sponte_ that the questions presented were not ripe. _Id._ at 284. The Court reasoned that "[e]ven if New York does adopt the regulations _en masse_, we still would not know which utilities will opt into the program or where they will locate their central collection facilities." _Id._ Similarly, the affidavits in this case do not clearly define when or how Plaintiffs would be affected. As the _Atlantic States_ Court observed, a "claim is not ripe for adjudication if it rests upon contingent future events that may not

occur as anticipated, or indeed may not occur at all." Id. (quoting Texas v. United States, 523 U.S. 296, 300 (1998)).

Lastly, as to the finality requirement, our Court of Appeals has previously held that agency action is not final where "it does not itself adversely affect [the plaintiffs] but only affects [their] rights adversely on the contingency of future administrative action." DRG Funding Corp. v. Sec'y of Hous. & Urban Dev., 76 F.3d 1212, 1214 (D.C. Cir. 1996) (hereinafter "DRG Funding").

Plaintiffs argue that the Aquaculture FMP is final because it became law by default. Pls.' Opp'n at 24. They rely on the rationale that because the "Gulf FMP will govern and predetermine virtually all of the content of the final regulations and permitting framework," it is effectively final. Id. This reasoning fails to meet the standard established in DRG Funding. Despite the statute's requirement that the regulations be "consistent with the [FMP]," there is simply no way to predict exactly how the end product--the FMP and its implementing regulation--will ultimately operate. 16 U.S.C. § 1854(b)(1).

Several variables will significantly affect how, and whether, the Aquaculture FMP impacts the Gulf: the NMFS determination of whether the Plan is consistent with the national policy it intends to develop; the text of the future regulations; approval or disapproval of permits by the various government bodies on a case-

by-case basis; and the as-yet unknown locations of future aquaculture sites.  Accordingly, Plaintiffs' characterization of the FMP as "final," when compared to the standard for finality established in DRG Funding, is not accurate.  DRG Funding, 76 F.3d at 1214.

The end result of this analysis is that Plaintiffs' claims, although they do present legal questions, are still not fit for judicial review for two reasons:  first, because Plaintiffs' claims would "benefit from a more concrete setting" where injury has actually taken place; and second, because they currently relate to agency action that is not final.  Atlantic States, 325 F.3d at 284.

In the absence of fitness for judicial decision, courts must look to a balancing of the hardships to make a final assessment of ripeness.  Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 440 F.3d 459, 465 (D.C. Cir. 2003).  Plaintiffs state that because "they are subject to regulation under the Gulf FMP and must change their own behavior to avoid aquaculture sites," the hardship scale is tipped in their favor.  Pls.' Opp'n at 30.  However, Plaintiffs cannot establish that delaying suit would be sufficiently disadvantageous to their case because as of yet, they are "not required to engage in, or to refrain from, any conduct." Atlantic States, 325 F.3d at 285.  As noted, the FMP itself does not require or forbid any action.  In Ohio Forestry Association, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998), the Supreme Court

concluded that hardship would not result from withholding consideration of a matter where the terms of an agency plan "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations."

As in Ohio Forestry, Plaintiffs can bring their suit at a later time, after "harm is more imminent and more certain." Id. Deferring consideration of the dispute until that point serves important interests both in avoiding "interfer[ence] with the system that Congress specified for the agency to reach [marine fishery] decisions," and in judicial economy. Id. at 1671.

Contrary to Plaintiffs' position, if their claims are dismissed, they will not be barred from bringing suit at a later time by the MSA's "30-day statute of limitations." 16 U.S.C. § 1855(f)(1); accord Defs.' Reply at 14 ("Because the Secretary has not yet promulgated regulations or taken action under the regulations, the Magnuson Act's statute of limitations has not yet been triggered."); Defs.' Reply at 2. A reading of the statute that suggests otherwise rests on the mistaken premise that the Aquaculture FMP is itself a regulation. See infra at III.C.1.

Plaintiffs do not provide compelling hardship arguments to outweigh the absence of injury and fitness. Plaintiffs "may protect all of their rights and claims by returning to court when

the controversy ripens." <u>Atlantic States</u>, 325 F.3d at 285.  In short, Plaintiffs' claims are not ripe for judicial review.

### C. Plaintiffs Have No Statutory Cause of Action Under Either the MSA or the APA.

#### 1. The MSA Does Not Provide for Review of the Aquaculture FMP.

Section 1855(f)(1)-(2) of the MSA provides for judicial review of "regulations promulgated by the Secretary," as well as other "actions taken by the Secretary under regulations which implement a[n FMP]." 16 U.S.C. §§ 1855(f)(1)-(2).  The statute, however, does not specifically provide for judicial review of FMPs.  Section 1855(f)(1), which discusses the 30-day time frame in which a suit brought under the MSA must be filed, unambiguously refers to the promulgation of the regulations, and not the FMPs, as the event which marks the beginning of that time frame.  The statute clearly distinguishes between FMPs and regulations throughout.  See 16 U.S.C. §§ 1854(a)-(b) (separating the procedures for FMPs and regulations into different sub-sections).  The Court therefore finds no merit in Plaintiffs' assertion that "the MSA explicitly provides for pre-implementation judicial review of FMPs and actions under them."  Pls.' Opp'n at 25.

Additionally, as Defendants rightly argue, NMFS' inaction-- i.e. allowing the FMP to take effect by operation of law--cannot constitute the promulgation of a regulation because: (1) NMFS has not characterized the FMP as a regulation; (2) the FMP was not

published in the Federal Register or Code of Federal Regulations after notice and comment; and (3) the FMP has no binding effect on private parties or on the agency.  Id. at 26-27; see also Molycorp, Inc. v. EPA, 197 F.3d 543, 545 (D.C. Cir. 1999) (noting three criteria for determining when an agency action can constitute the promulgation of a regulation).

Plaintiffs nonetheless contend that "[t]his Court has already held that an FMP is a 'regulation' within the meaning of Section 1855(f) such that a plaintiff may challenge it under this provision even where the FMP does not 'result[] in the promulgation of a formal regulation.'"  Pls.' Opp'n at 33 (quoting Daley, 183 F. Supp. 2d at 10).  However, Plaintiffs' assertion oversimplifies the holding in Daley and ignores the clear text of the MSA.  Daley does not support the proposition that all FMPs constitute "regulations" under the meaning of § 1855(f)(1)-(2), and therefore are ripe for adjudication under the MSA.  Rather, Daley holds that where amendments to FMPs are "applied generally to many fisheries, have future effect, [and] are designed to interpret and prescribe law and policy," the Secretary's decision to approve those amendments qualifies as a reviewable action.  183 F. Supp. 2d at 11. Additionally, the federal defendants in Daley, which are the same entities as Defendants in this case, agreed that passage of the EFH Amendments were reviewable agency action.  Id. at 10 n.4.

The EFH Amendments to the FMPs at issue in Daley were substantively different from the Aquaculture FMP here, because, unlike the EFH Amendments, the FMP does not have future effect, nor does it prescribe law and policy. It is merely a detailed blueprint, the full implementation of which depends on the passage of regulations and issuance of permits. See Daley, 183 F. Supp. 2d at 11. Further, in this case, unlike <u>Daley</u>, NMFS did not make the active decision to approve the Council's Plan. Daley is therefore distinguishable from the instant case, as the EFH Amendments at issue in Daley are very different from the Aquaculture FMP at issue here.

Without any formal regulations implementing the FMP, Plaintiffs lack a statutory cause of action under § 1855(f) of the MSA.

### 2. Plaintiffs Have No Cause of Action under the APA because Defendants' Actions Are Not Final.

In the alternative, Plaintiffs argue that their claims are cognizable under §§ 706(1)-(2) of the APA. Plaintiffs allege that NMFS' failure to approve, partially approve, or disapprove the FMP within the 30-day window constituted a "failure to act" resulting in unlawfully withheld agency action, or alternatively, that NMFS' affirmative decision to allow the FMP to take effect by operation of law constituted agency action, both of which are reviewable under the APA. Compl. ¶¶ 73-88.

However, § 704 of the APA limits judicial review to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court . . . " 5 U.S.C. § 704 (emphasis added). If the agency action is not final, a court cannot adjudicate the dispute. See DRG Funding, 76 F.3d at 1215-16 (holding that action by the Secretary of the Department of Housing and Urban Development was not final agency action which a court could review under the APA). According to our Court of Appeals, "[a] final agency action is one that marks the consummation of the agency's decisionmaking process and that establishes rights and obligations or creates binding legal consequences." Nat'l Res. Def. Council v. EPA, 559 F.3d 561, 564 (D.C. Cir. 2009); see also DRG Funding, 76 F.3d at 1214 (quoting several formulations of finality test).

    As discussed above, the FMP does not constitute final agency action without promulgation of the corresponding regulations: neither approval of the FMP nor failure to act on it marks the end of the decisionmaking process; nor does the FMP establish any rights or obligations or create any binding legal consequences. Adoption of implementing regulations is mandatory; after that point, aquaculture may begin if permits are applied for and approved.

Furthermore, § 704 specifically states that "a preliminary, procedural, or intermediate agency action" is only subject to

review upon "review of the final agency action." 5 U.S.C. § 704. Plaintiffs therefore are incorrect that their inability to challenge the Aquaculture FMP at this time renders any future challenges to it "off-limits." See Pls.' Opp'n at 38.

In this case, regardless of whether allowing the FMP to take effect by operation of law constitutes "unlawfully withheld agency action" or actual "agency action," NMFS has not taken any final agency action which would be subject to judicial review. Here, the FMP does not "adversely affect [Plaintiffs] but only affects [their] rights adversely on the contingency of future administrative action." DRG Funding, 76 F.3d at 1214. Consequently, Plaintiffs do not have a statutory cause of action under the APA, and their claims are dismissed for failure to state a claim upon which relief can be granted. See Oryszak v. Sullivan, 576 F.3d 522, 525 n.2 (D.C. Cir. 2009) ("Recently we clarified that the provision of the APA limiting judicial review to 'final agency action,' 5 U.S.C. § 704, goes not to whether the court has jurisdiction but to whether the plaintiff has a cause of action, though some prior opinions had 'loosely referred to the final agency action requirement as jurisdictional.'") (citation and internal quotations omitted).

**IV. CONCLUSION**

For the reasons set forth above, the Defendants' Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) is **granted.** An order will accompany this Memorandum Opinion.


August 12, 2010
　　　　　　　　　　　　　　　　　　　／s／_____
　　　　　　　　　　　　　　　　　　　Gladys Kessler
　　　　　　　　　　　　　　　　　　　United States District Judge


**Copies to**: attorneys on record via ECF